**M. Mark MENDEL, et al.**

v.

**The HOME INSURANCE COMPANY.**

Civ. A. No. 92–1217.

United States District Court,
E.D. Pennsylvania.

Nov. 17, 1992.

---

Stephen J. Mathes, Hoyle, Morris & Kerr, Philadelphia, Pa., for plaintiffs.

Edwin L. Scherlis, Margolis, Edelstein & Scherlis, Philadelphia, Pa., for defendant.

## MEMORANDUM

BARTLE, District Judge.

Plaintiffs M. Mark Mendel, Esquire ("Mendel"), Daniel E. Murray, Esquire ("Murray"), and M. Mark Mendel, Ltd. ("Mendel Ltd.") (collectively "the insureds"), have instituted this diversity action against their professional liability insurance carrier, The Home Insurance Company ("Home"). The insureds seek to compel Home to pay on their behalf a judgment of $1,690,670 which was jointly and severally entered against them as a result of an adverse jury verdict in this Court on December 9, 1991, in the case of *Silver v. Mendel, et al.*, Civil Action No. 86–7104 ("*Silver*"). Home has counterclaimed for a declaratory judgment, seeking a declaration that it has no obligation to its insureds under the policy. Before the Court are cross-motions for summary judgment.

The backdrop for this action arises out of a highly charged business dispute between Marc Silver ("Silver"), a principal in the Marshall–Silver Construction Company ("Marshall–Silver") and its subcontractor Barton and Company ("Barton"). During 1984 insureds Mendel and Murray, in addition to practicing law, were officers of Barton. The Barton–Silver dispute escalated to the point where, in mid–1984, Mendel apparently made certain threats, including a threat to destroy Silver's business. Thereafter, in December, 1984, the law firm of Mendel Ltd., representing Barton and two other creditors, filed in this District, under Murray's signature, a petition for involuntary bankruptcy against Marshall–Silver. Several months later, the Bankruptcy Court dismissed the petition because the additional creditors failed to post the required bond.

In December, 1986 Silver and Marshall–Silver filed separate actions in this Court against the insureds arising out of the allegedly wrongful bankruptcy filing. Substantial activity in both cases, including various motions and appeals to the Court of Appeals of this Circuit, followed. As of June 14, 1990, upon the resolution of the pretrial appeals, the *Marshall–Silver* suit had been dismissed. In the *Silver* case,

however, three claims remained against the insureds: (1) intentional interference with contractual relations; (2) intentional interference with prospective contractual relations; and (3) intentional infliction of emotional distress. Only after the completion of the pretrial appellate process did Home attempt to reserve its right to cover the insureds based on the intentional nature of the acts alleged.

The *Silver* case was tried before The Honorable Joseph L. McGlynn, Jr. and a jury between November 25 and December 9, 1991. The jury, in answer to special interrogatories, found that each of the insureds had intentionally interfered with Silver's contractual and prospective contractual relations. It returned a verdict in favor of Silver and against the insureds for $1,690,670. Judgment was entered on the verdict.

In the meantime, in the spring of 1986, the insureds had notified Home, their professional liability insurer, of an adversary proceeding Silver had filed in the Bankruptcy Court. Silver alleged that the bankruptcy petition, which Mendel Ltd. had filed against Marshall–Silver, had been filed in bad faith. Home, in July, 1986, retained H. Robert Fiebach, Esquire ("Fiebach"), of the Philadelphia law firm of Wolf, Block, Schorr and Solis–Cohen to represent the insureds. Fiebach continued to represent Mendel, Murray and Mendel, Ltd. in both the *Silver* and *Marshall–Silver* lawsuits which were filed against the insureds late in 1986.

The insureds argue that they are entitled to summary judgment on all claims [1] on one or more of the following grounds: (1) the exclusion clause of the Home policy does not exclude coverage for the intentional economic torts which gave rise to the *Silver* judgment; (2) Mendel Ltd. is an "innocent party" and is protected by a waiver clause in the policy which exempts innocent parties from the exclusion clause upon which Home relies; (3) Home is estopped from denying coverage because, even if it is assumed that the company's reservation of rights letter was sent as early as September of 1990, the nearly four year delay in giving notice prejudiced the insureds as a matter of law; and (4) there is no evidence whatsoever that Home ever notified its insured Murray of any reservation of rights before November, 1991, on the eve of the *Silver* trial.

Home challenges each of the grounds upon which the insureds rely in their motion. In addition, it moves for summary judgment on the following grounds: (1) the policy excludes from coverage the "deliberately wrongful acts" which gave rise to the judgment in the *Silver* case; (2) the issuance of its September, 1990 reservation of rights letter precludes any claim of prejudice on the part of the insureds; and (3) no basis exists for finding bad faith by Home, pursuant to 42 Pa.Const.Stat.Ann. § 8371, if that statute is held applicable to the case at bar.

*Summary Judgment Standards*

■ The standards for deciding summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure are well settled.[2] To obtain summary judgment, the moving party must establish that no genuine issues of material fact remain in dispute. *Celotex Corporation v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party. A factual dispute is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 248, 106 S.Ct. 2505, 2511, 2510, 91 L.Ed.2d 202 (1986).

---

1. The causes of action contained in the insureds' complaint in this case are as follows: Breach of Contract (Count I); Breach of Fiduciary Duties (Counts II and III); Negligent Failure to Settle (Count IV); and Bad Faith Under 42 Pa.Const. Stat.Ann. § 8371 (Count V).

2. Rule 56(c) provides in pertinent part that:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In deciding whether the summary judgment standard has been met, the evidence, of course, must be viewed in the light most favorable to the non-moving party. *Mellon Bank Corp. v. First Union Real Estate Equity and Mortg. Invest.*, 951 F.2d 1399, 1404 (3d Cir.1991). Further, in ruling on a summary judgment motion a court may, in appropriate cases, render partial summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. *See Cohen v. Board of Trustees*, 867 F.2d 1455 (3d Cir.1989) (*in banc*) and Fed. R.Civ.P. 56(d).[3]

### The Exclusion Clause

The exclusion clause of the Home professional liability policy issued to the insureds, provides in Section I(a) that:

I. This policy does not apply:

(a) to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, maliciously or *deliberately wrongful acts* or omissions committed by the insured. However, notwithstanding the foregoing, the Company will provide a defense for any such claim without any liability on the part of the Company to pay such sums as the insured shall become legally obligated to pay as damages.

(emphasis added).

The parties agree that the question of the applicability of this exclusion clause to the judgment returned in the *Silver* case is a question of law as to which extrinsic evidence need not be considered. *See Niagara Fire Insurance Co. v. Pepicelli,*

*Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216, 219 (3d Cir.1987).

Home has invoked the clause, and has refused to indemnify the insureds as to the *Silver* judgment on the ground that the intentional torts which resulted in that judgment were "deliberately wrongful acts" included in the exclusion clause. The insureds, however, argue (1) that their intentional economic torts were not "deliberately wrongful acts" under the exclusionary clause; (2) that the term "deliberately wrongful acts," which was not defined in the policy, is unclear and ambiguous; and (3) that such ambiguity requires that the exclusionary clause be construed in favor of the insureds.

Under Pennsylvania law, which both parties agree is applicable, policy ambiguities must be resolved in favor of the insured. An ambiguity exists "if words may *reasonably admit* of different meanings." *Mellon Bank N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980) (emphasis added).[4] Policy language must not be tortured, however, to create an ambiguity where none exists and policy provisions should be read to avoid ambiguities if possible. *See Niagara Fire*, 821 F.2d at 220.

No basis exists for concluding that the subject exclusion clause is ambiguous. We agree with *Home Ins. Co. v. Bullard*, 850 F.2d 692, 1988 WL 71192, *4, *5–6, 1988 U.S.App. LEXIS 9357, *8, *12–13 (6th Cir.1988), which held that an identical exclusionary clause was applicable to intentional acts.[5] *See also Warren v. Lemay,*

---

**3.** Rule 56(d) provides in full as follows:

**Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such fur-

ther proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**4.** Pennsylvania law further provides that unambiguous writings are interpreted by the court as a matter of law, while ambiguous writings are interpreted by the fact finder. *Mellon Bank, N.A.,* 619 F.2d n. 10 at 1011.

**5.** Because the *Bullard* case was not recommended for full-text publication, the Sixth Circuit placed certain restrictions on its use in other Sixth Circuit proceedings. Those restrictions, however, do not preclude this Court's reli-

144 Ill.App.3d 107, 98 Ill.Dec. 279, 282, 494 N.E.2d 206, 209 (1986).

An *intentional* and unprivileged interference must be established to prove an intentional interference with contractual relations, or with prospective contractual relations. *Adler, et al. v. Epstein, et al.,* 482 Pa. 416, 393 A.2d 1175, 1182–1184 (1978), *cert. denied,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *see also Geyer v. Steinbronn,* 351 Pa.Super. 536, 506 A.2d 901, 909–910 (1986). The terms "deliberate" and "intentional" are synonymous. *See Home Ins. Co. v. Bullard, supra; Warren v. Lemay, supra.*[6] Thus, in *United States Fidelity & Guaranty Co. v. Fireman's Fund Ins. Co.,* 896 F.2d 200 (6th Cir.1990), the Court agreed with the District Court's "determination that the only reasonable construction of the exclusionary clause, which similarly prohibited coverage for 'dishonest, fraudulent, criminal or malicious acts,' is that Fireman's Fund contracted to provide coverage for negligent— not intentional—acts ..." *See also Employers Reinsurance Corp. v. Martin, Gordon & Jones, Inc.,* 767 F.Supp. 1355, 1359–1361 (S.D.Miss.1991).

There can be no question that the Home policy excludes coverage for the individual insureds Mendel and Murray since the jury found that they were each liable to Silver for intentional interference with contractual and prospective contractual relations.

*The "Innocent Party" Clause*

■ The issue remains, however, whether the exclusion extends to the law firm of Mendel Ltd., a corporation. Mendel Ltd. claims entitlement to coverage based on an "innocent party" policy provision which provides that insureds "who did not personally participate" in the acts giving rise to an exclusion are not subject to that exclusion.[7] It further argues that Pennsylvania law does not allow innocent insureds to be deprived of coverage because of the intentional acts of their co-insureds.

It is, of course, axiomatic that a corporation is a creature of fiction that can only act through its officers, directors and other agents. A corporation is, however, bound by its agent's acts so long as those acts are "performed within the agent's implied or apparent authority, unless the agent acted for his own benefit without the corporation's ratification of his action." *Lokay v. Lehigh Valley Cooperative Farmers, Inc.,* 342 Pa.Super. 89, 492 A.2d 405, 409 (1985).

In this case, the acts at issue are those of one or more corporate officers or directors of Mendel Ltd. Mendel and Murray, officers or directors of Mendel Ltd., here spoke and acted for the corporation. Murray signed the bankruptcy filing which the *Silver* jury found amounted to an intentional interference with contractual relations and with prospective contractual relations. Further, the record establishes that Murray was not only a 12% shareholder in the corporation, but also the "administrative partner" and Secretary–Treasurer of the corporation, and its only corporate officer besides the President (Murray deposition at 16, 19; Mendel deposition at 33, 41). Equally significant, was a statement made by Mendel, the corporation's President and controlling shareholder (*see* Plaintiffs' Supplemental Exhibit A; Mendel deposition at 21), when he completed the corporation's 1986 policy renewal application statement

---

ance on the decision or undermine the persuasiveness of its holding.

6. *See also* Webster's New Universal Unabridged Dictionary which defines "deliberate," in pertinent part, as:
 1. carefully thought out or formed; premeditated; done on purpose.
and gives "intentional" as a synonym. It defines "intentional" as:
 1. having to do with intention or purpose. [Rare.]
 2. intended; designed; done with design or purpose; as the act was *intentional,* not accidental.

and gives "deliberate" as a synonym.

7. The innocent party provision of the policy provided that where coverage would be excluded, suspended or lost because of a judgment or final adjudication based on or arising out of deliberately wrongful conduct,

 such insurance as would otherwise be afforded under this policy shall apply with respect to each and every Insured *who did not personally participate in committing one or more of the acts, errors, omissions or personal injuries described in any such exclusion or condition* (emphasis added).

**1212**

for the Home professional liability policy. In discussing the corporation's representation of Barton, in connection with the *Marshall–Silver* bankruptcy filing, Mendel declared that *"This law firm is acting on behalf of its client and itself."* (Plaintiffs' Exhibit 4, pg. 3 (emphasis added)).

Thus, the insureds do not and could not argue that the bankruptcy filing either exceeded Murray's implied or actual corporate authority or was not ratified by the corporation. Accordingly, "... the unauthorized and unpredictable act of [a corporate] agent ..." is not at issue here. *See Pennbank v. St. Paul Fire & Marine Ins. Co.*, 669 F.Supp. 122, 126 (W.D.Pa.1987).[8]

In this case, as in *FDIC v. Mmahat*, 907 F.2d 546 (5th Cir.1990), there was a jury finding against the corporation itself. In that case coverage was denied to a law firm despite an "innocent party" clause, because there was a finding that the law firm, as well as the individual lawyer, had breached a duty. *See also Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1317 (5th Cir.1982).

The cases relied upon by insureds are not on point. In *Maravich v. Aetna Life & Casualty Co.*, 350 Pa.Super. 392, 504 A.2d 896, 906 (1986), the innocent insured wife was permitted to recover on a home insurance policy, despite arson by her spouse, only because "the exclusion clause voided only the coverage provided to the insured who had been responsible for causing the loss." The insureds' reliance on *American States Insurance Co. v. Borbor*, 826 F.2d 888 (9th Cir.1987) is also misplaced. There coverage was extended to an insured for the wilful acts of her co-partner and husband, only because the District Court found

that she "was innocent of any wrongdoing."

Here, Mendel Ltd. was not an innocent party. As the jury in *Silver* found, it "personally participated" in the intentional acts against Silver as a result of the acts of its officers or directors. Consequently, Mendel Ltd. is subject to the exclusion clause in Home's policy.

*Reservation of Rights*

■ The insureds, as a ground for summary judgment, argue that Home is estopped from relying on the "deliberately wrongful acts" policy exclusion because of its failure to reserve its rights under this provision until November 21, 1991, on the eve of the *Silver* trial when Mendel and Murray claim that they first saw the letter. Alternatively, the insureds claim that Home is still estopped even if they received such a letter in September, 1990, almost 4 years after the *Silver* case was initiated and some 14 months before the trial commenced. Home, in its cross-motion for summary judgment, argues that it reserved its rights in a timely manner.

The first question which must be resolved is whether there exist genuine issues of material fact with respect to Home's contention that it mailed a reservation of rights letter on September 4, 1990, and that the insureds received it on September 7, 1990, more than 14 months before the commencement of the *Silver* trial. An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2511. We find that no such genuine issue exists.

**8.** Mendel Ltd.'s claim that it is an innocent party, within the meaning of the policy, largely relies on a December 9, 1991 letter sent to the insureds by Allan D. Windt, Esquire ("Windt"), Home's coverage counsel. That letter, which was sent during the *Silver* trial, stated in part:
... if the law firm itself is held liable, it can be held liable solely on a theory of respondeat superior—that is it can be held liable only because the wrongdoing of the attorneys is deemed to be wrongdoing of the firm.
Based thereon, Mendel Ltd. maintains that Home, by relying on a theory of respondeat

superior, conceded that the corporation did not "personally participate" in the acts giving rise to the exclusion and therefore that the firm must be afforded coverage. Given Windt's limited role, however, his statement cannot be construed as a binding concession. Further, the *Silver* jury found that the corporation was actually, rather than vicariously, liable. *See* the *Silver* verdict sheet and the instructions to the *Silver* jury with respect to corporate liability. (Defendant's Exhibit 34; *Silver* Instructions, especially pages 8, 13, 14, 15, 17–18 and 22).

Earl Barkley, Jr. ("Barkley"), a Home employee with authority over the file at that time, prepared and signed the reservation of rights letter on September 4, 1990 (Defendant's Exhibit 29). Barkley testified:

Q. [By counsel for Home] Okay. Now, when the letter came back from typing, what did you do with it?

A. [By Barkley] I reviewed it to see if there were any corrections needed and signed it, put it in the envelope.

I sealed the envelope, put the certification on and the return receipt on, and I guess batched that with the other mail that I had, took it over to the mail bin.

. . .

Q. And did you personally place the letter, the reservation of rights letter, in the envelope and attach the receipt for certified mail and so on?

A. Yes.

Barkley also identified the Receipt for Certified Mail bearing the number "P 521 602 574" (Defendant's Exhibit 30) as the receipt which he used in connection with the letter (Defendant's Supplemental Exhibit E; Barkley deposition at pages 36, 45 and 46).

Despite the fact that Home could not produce the "green card" receipt for mail item "P 521 602 574," Patricia Vasta ("Vasta"), a Mendel Ltd. employee, testified that she received Certified Mail item number "P 521 602 574" on September 7, 1990. A Post Office receipt for mail item "P 521 602 574" (Defendant's Exhibit 31), the authenticity of which was established by an affidavit in conformity with Rule 902(2) of the Federal Rules of Evidence (see Defendant's Exhibit 37), showed that delivery was made by "GC" on September 7, 1990. In addition, Vasta identified her signature in the "Received by" portion of that Post Office receipt for mail item "P 521 602 574" (Plaintiffs' Supplemental Exhibit G; Vasta deposition at 19). Further, Mendel

himself admitted that it was Vasta's signature which was on the Post Office receipt (Plaintiffs' Supplemental Exhibit A; Mendel deposition at 167–168).

Notwithstanding the strength of the foregoing evidence, the insureds maintain there are genuine issues of material fact regarding the date of the letter's receipt since it *may* not have been in the envelope which was delivered. They rely on the absence of the Certified Mail number "P 521 602 574" on the face of the letter itself (*see* Plaintiffs' Supplemental Exhibit E; Barkley deposition at 173) and certain questions which were asked of Barkley about the procedures which he followed when two certified letters were sent out in the same file on the same day (*Ibid.* at 171). They do not explicitly argue, however, that the reservation of rights letter was confused with other correspondence—either certified or uncertified—which Home sent concerning the Mendel matter at about that time.[9]

The insureds' argument is unpersuasive. It relies upon inferences which are without evidentiary support and ignores Barkley's clear testimony that he placed the reservation of rights letter in the envelope, sealed the envelope, and affixed the return receipt card for item "P 521 602 574" to it. Moreover, Vasta's testimony that she signed the postal receipt for the letter is compelling. Based upon these undisputed facts, a reasonable jury would be compelled to conclude that the office of Mendel Ltd. received the reservation of rights letter on September 7, 1990. Vasta's receipt of the letter, in the scope of her employment and in her capacity as an employee authorized to receive mail, is sufficient to notify Mendel Ltd. of its receipt, whether or not it was ever seen by Mendel or Murray in the office. *See American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, n. 16 at 270–271 (5th Cir.1981). *See also Continental Oil Co. v. Bonanza Corp.*,

9. In response to the insureds' argument, Home maintains that no factual basis whatsoever exists for concluding that another letter was sent as certified mail item "P 521 602 574" in place of the reservation of rights letter. To support this conclusion it avers that the only other letter dated September 4, 1990, was a letter from Barkley to Fiebach, and points out that Fiebach could not have inadvertently received the reservation of rights letter in its place since he was unaware of the reservation letter's existence until November, 1991 (Defendant's Reply Brief at 16–17).

706 F.2d 1365, 1376–1377 (5th Cir.1983), and *Dillon v. Berg,* 326 F.Supp. 1214, 1224 (D.Del.1971).

■ Mendel, the firm's President and controlling shareholder, does not specifically argue that the principle of constructive notice is inapplicable to him. Murray, however, maintains the letter did not constitute notice to him since it was addressed to Mendel Ltd. and directed to the attention of Mark Mendel. He further contends that "a copy of the reservation of rights letter should be sent to each person or entity that may assert a right to be covered." He cites only Ostrager and Newman, *Handbook on Insurance Disputes,* Fourth Edition, § 2.03 at pg. 39, in support of this proposition.

While no one can dispute that it may be the better practice to send each insured a reservation of rights letter, this Court has found no precedent, and the insureds have cited none, requiring or even recommending that such a procedure be followed in every possible situation without exception.

The undisputed facts establish that Murray was one of only five shareholders in Mendel Ltd., a small organization with but one location. He was the firm's administrative partner and the only corporate officer besides Mendel, the President. He and Mendel worked closely together. The 1986 policy renewal application submitted to Home listed a total of five "officers, directors or shareholders," including Mendel and Murray. It also showed a total of only 13 additional employees, 2 of whom were lawyers. Thus, Home reasonably could conclude that notice to Mendel, as President of Mendel Ltd., would be communicated among and between the officers, directors and shareholders. Indeed, the record discloses that that is precisely what happened when Robert Fiebach, counsel retained by Home to represent its insureds in the *Silver* litigation, "faxed" to Mendel Ltd. a Home reservation of rights letter on November 21, 1991. It was Murray, not Mendel, who first learned of its contents and Murray assisted Mendel in reviewing the file to determine whether it had been received earlier (Plaintiffs' Exhibit 21; Mendel deposition at 172, 303, 304).

Further, the September, 1990 reservation of rights letter itself (Defendant's Exhibit 29) could not have mislead Murray, a lawyer, on the question of whether Home intended to apply the exclusion to him. The letter first quoted the applicable policy provisions. Thereafter it stated that:

> In the event there is a judgment or final adjudication based upon and or arising out of *any* dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions or, the infliction of emotional distress, *committed by or at the direction of the Insured,* then and in that event, there would be no coverage provided for such acts or omissions.

(emphasis added). Thus, Home made it very clear that it was invoking the exclusionary clause as to the qualifying actions of *any Insured.* Under the undisputed facts of this case, Murray was, at the very least, constructively notified of the reservation of rights letter and his lack of coverage under the policy exclusion.

### The Issue of Prejudice

Although the exclusionary clause of the policy is applicable to all of the insureds, the remaining question is whether Home is estopped from relying on the exclusion because it delayed until September 4, 1990, nearly four years after the filing of the *Silver* action, to issue its reservation of rights letter in that action.

At the time of the issuance of the reservation of rights letter, virtually all discovery remained to be completed because that process had been held in abeyance pending disposition of the various motions and appeals. Moreover, as previously noted, the trial did not begin until more than 14 months after the letter's issuance.

Home therefore argues that no basis exists for finding that the insureds were prejudiced by the issuance of the reservation of rights letter in September, 1990. Insureds, on the other hand, contend that the delay of nearly four years creates an irrebuttable presumption of prejudice, entitling them to

a judgment against Home as a matter of law.

■ Home has not brought to the Court's attention any case applying Pennsylvania law which is exactly on point. Cases cited by the company, considering the effect of an insurer's failure to assert all possible defenses when denying coverage, however, are instructive. In such instances the Pennsylvania courts and the federal district courts interpreting Pennsylvania law have refused to apply a strict waiver theory or a theory of presumptive prejudice. Rather, the doctrine of estoppel requiring an analysis of facts relating to actual prejudice is employed. *See, e.g., Federal Insurance Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 171 (M.D.Pa.1989); *Weintraub v. St. Paul Fire & Marine Ins. Co.*, 609 F.Supp. 273, 275 (E.D.Pa.1985).

■ Under Pennsylvania law the burden rests on the party asserting an estoppel to establish the defense by "clear, precise and unequivocal evidence." *Chrysler Credit Corp. v. First Nat. Bank and Trust Co.*, 746 F.2d 200, 206 (3d Cir.1984). Thus, in the context of an insurer's failure to assert all possible defenses to coverage, the courts apply an estoppel only when there is actual prejudice, that is, when the failure to assert all possible defenses causes the insured to act to his detriment in reliance thereon. *Federal Insurance Co.*, 727 F.Supp. at 171–172; *Weintraub*, 609 F.Supp. at 275; *Bensalem Township v. Western World Ins. Co.*, 609 F.Supp. 1343, 1347 (E.D.Pa.1985).

■ Similarly, in *Guaranty Nat. Ins. Co. v. Chester County Housing Authority*, 714 F.Supp. 747, 752 (E.D.Pa.1989), the Court required detrimental reliance on the part of the party seeking estoppel. In that case the issue arose in the context of an insurer's delayed attempt to deny coverage during the course of litigation which was in progress to determine the obligations of three potentially liable insurers.

In support of its position that an irrebuttable presumption of prejudice exists, the insureds rely primarily on six cases. Those cases, however, either were decided under the law of jurisdictions which, unlike Pennsylvania, utilizes a theory of presumptive prejudice or are factually distinguishable.

In *Cozzens v. Bazzani Bldg. Co.*, 456 F.Supp. 192, 201 (E.D.Mich.1978), for example, the Court found that a conditional, oral notice of a reservation of right which was given almost two years after the filing of the complaint and not "until practically the very end of the pretrial proceedings" was untimely. Then, based on Michigan law, it found that such notice was " 'too late to avoid the *presumptive* prejudice of [the insured's] rights and plaintiff's consequential rights.' " *Ibid.* at 201–202, quoting *Meirthew v. Last*, 376 Mich. 33, 135 N.W.2d 353 (1965) (emphasis in original). Such a presumption, however, does not exist under Pennsylvania law.

The insureds' reliance on *Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.*, 550 F.Supp. 710 (W.D.Okla.1981), is likewise without merit. In that case notice of a reservation was given, if at all, only two days before the commencement of trial. In addition, Oklahoma law which controlled in that case, applies an estoppel based on a theory of presumptive prejudice where there is such a delay in notice.

The next case cited, *Beckwith Machinery Co. v. Travelers Indemnity Co.*, 638 F.Supp. 1179 (W.D.Pa.1986), did apply Pennsylvania law. It, however, is not helpful to the insureds on the issue of *presumptive* prejudice. In *Beckwith* the insurer abruptly denied coverage after the insured had relied upon it for coverage for 13 months. Summary judgment was granted on an estoppel theory because there was *actual,* not presumptive, prejudice. The Court found that the insured detrimentally relied on Travelers' policy for indemnification and that there were no genuine issues of material fact to preclude the grant of summary judgment.[10]

10. The Court noted, in pertinent part, that:
[b]ecause of its reliance on Travelers to defend the compensatory damages claims, Beck-

with was deprived of the opportunity to itself investigate and defend the Trumbell claims. The record in the case before us reveals that

In *Aetna Life and Casualty Co. v. McCabe*, 556 F.Supp. 1342 (E.D.Pa.1983), another case involving application of Pennsylvania law, the Court granted summary judgment and precluded an insurer from disclaiming coverage. There, however, the reservation of rights was issued more than a year after the complaint was filed, three days before the scheduled trial, and less than six months before the ultimate trial. The reservation of rights was found to be untimely because the company's delay "denied McCabe some information [which was] relevant to the extent [that] he should have used his personal attorney to assist investigation of the case and pretrial discovery." By way of contrast, and as previously noted, discovery in this case was delayed pending completion of the pre-trial appeals and took place primarily after the issuance of the September, 1990 reservation of rights letter.

Equally unpersuasive are the two other cases upon which the insureds primarily rely. In *New Amsterdam Casualty Co. v. Kelly*, 57 F.Supp. 209 (E.D.Pa.1944), a declaratory judgment action, the court entered judgment for the insured based on estoppel and waiver theories, without relying on a theory of presumptive prejudice. In *Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163 (1982), the court stated that "a long lapse of time without any indication by the insurance carrier of a loss or rejection of coverage, during which *the insured justifiably expects to be protected by the carrier* and cannot, except at the risk of forfeiting coverage, act for itself under the policy" are circumstances which "justify the imputation of prejudice sufficient to raise an estoppel against the insurer." *Ibid.*, 443 A.2d at 170–171 (emphasis added). *Griggs*, however, was a statement of New Jersey, not Pennsylvania, law. Further, given the level of sophistication of the insureds in this case, there is at least a factual question as to whether an expectation of coverage by them would be justified under the circumstances.[11]

Review of the foregoing authority conclusively establishes that, under the facts of this case and the applicable law, this Court should not grant summary judgment for the insureds under a theory of presumptive prejudice, that is, based on a finding of prejudice as a matter of law because of Home's delay in notification. This Court, however, also rejects Home's competing contention that it is entitled to summary judgment under the theory that the evidence viewed in the light most favorable to the insureds establishes that they were not prejudiced by the delay in the issuance of the reservation of rights letter.

Contrary to Home's arguments, the record does not conclusively establish the absence of prejudice to the insureds. Indeed, a review of the voluminous briefs filed in this case, large portions of which are devoted to parsing the evidence, demonstrates that the evidence is conflicting. Summary judgment is not appropriate under such circumstances.

*The Action for Bad Faith by Home*

 Finally, Home maintains that the insureds' claim for relief for bad faith under 42 Pa.Const.Stat.Ann. § 8371, should be withdrawn from the jury because this statute is not applicable to the case at bar. Section 8371 provides, in full, as follows:

Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

Travelers failed to conduct a proper investigation or a thorough discovery ...
*Ibid.* at 1188.

11. *Griggs* also noted that it may be appropriate in certain other contexts "not to impute conclusive prejudice but to impose a rebuttable presumption of prejudice ..." *Ibid*, n. 3 at 171.

Before the enactment of § 8371, private causes of action for bad faith could not be brought against insurers under Pennsylvania law. *American Franklin v. Galati*, 776 F.Supp. 1054, 1062–1063 (E.D.Pa.1991). Although insurance companies conducting business within the Commonwealth were nevertheless affirmatively bound to administer their policies in good faith, the Pennsylvania General Assembly had determined that the bad faith of insurance carriers was exclusively a regulatory matter. *Ibid.* at 1062. Effective as of July 1, 1990, however, § 8371 created such a private right of action in Pennsylvania. This Court, therefore, must decide if that recent statute can be invoked in this case which involves the administration of a policy in effect from April 16, 1985, through April 16, 1986.

There is a division of authority within this District regarding the applicability of § 8371 to cases such as the one at bar. A few opinions have held that the statute applies only to causes of action arising out of insurance contracts that were entered into after § 8371's effective date. *See Amissah v. Will Penn Insurance Co.*, 1992 WL 122844, 1992 U.S. District LEXIS 8854 (E.D.Pa. May 29, 1992); *McAlister v. Sentry Insurance Co.*, 1991 WL 102973, 1991 U.S. District LEXIS 7945 (E.D.Pa. June 11, 1991); *Bryant v. Liberty Mutual Insurance Co.*, 1990 WL 223126, 1990 U.S. District LEXIS (E.D.Pa. Dec. 20, 1990). The majority of the cases considering this issue, however, have held that actions brought under § 8371 are appropriate where they arise out of actions taken by an insurer after the statute's effective date. *See Rottmund v. Continental Assur. Co.*, 1992 WL 192655, 1992 U.S. Dist. LEXIS 11705 (E.D.Pa. Aug. 4, 1992); *Resolution Trust v. Independence Blue Cross*, 1992 WL 219717, 1992 U.S. Dist. LEXIS 13182 (E.D.Pa. Sept. 1, 1992); *American Franklin Life Ins. Co. v. Galati*, 776 F.Supp. 1054 (E.D.Pa.1991); *Coyne v. Allstate Insurance Co.*, 771 F.Supp. 673 (E.D.Pa. 1991); *Santoro v. Allstate Insurance Co.*, 1991 WL 197419, 1991 U.S. District LEXIS 13591 (E.D.Pa. Sept. 25, 1991); and *Wazlawick v. Allstate Insurance Co.*, 1990 WL 294273, 1990 U.S. Dist. LEXIS 15986 (E.D.Pa. Sept. 28, 1990). *See also Liberty Mut. Ins. Co. v. Paper Manufacturing Co.*, 753 F.Supp. 156, 160 (E.D.Pa.1990). *See further Seeger v. Allstate Ins. Co.*, 776 F.Supp. 986 (M.D.Pa.1991).

This Court concludes that the latter view is the more persuasive one. There is no reason not to impose liability on an insurer, once it has notice of the statute's enactment, for subsequent bad faith conduct toward its insureds. Consequently, the action brought against Home under § 8371 may go forward as to any of its actions which occurred on or after July 1, 1990, the statute's effective date.

Finally, Home contends that it is entitled to summary judgment as to the claim for relief brought under § 8371 because the evidence in the record, even viewed in the light most favorable to the insureds, could not establish bad faith. A review of the record, however, demonstrates that genuine issues of material fact exist. The issue of bad faith on the part of Home, from July 1, 1990 onward, is not susceptible to summary judgment disposition. Like the question of prejudice, the question of whether Home acted in bad faith as to the insureds after the effective date of § 8371, is for the jury to decide.

## ORDER

AND NOW, this 17th day of November, 1992, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that the motions for summary judgment filed by plaintiffs M. Mark Mendel, Ltd., M. Mark Mendel, Esquire, and Daniel Murray, Esquire, and by defendant, The Home Insurance Company, are DENIED.

It is further ORDERED that partial summary judgment is GRANTED pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, and that this Court hereby DETERMINES that the following matters are without substantial controversy in accordance with Rule 56(d):

1. The Home Insurance Company Policy Number LPL 1544603 excludes from coverage the December 9, 1991 judgment en-

tered against M. Mark Mendel, Ltd., M. Mark Mendel, Esquire, and Daniel Murray, Esquire, for the intentional interference with contractual relations and with prospective contractual relations, in *Silver v. Mendel, et al.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 86–7104.

2. Plaintiff M. Mark Mendel, Ltd. is not entitled to invoke the innocent party exception of professional malpractice insurance Policy Number LPL 1544603 which was issued to it by defendant, The Home Insurance Company.

3. Plaintiffs M. Mark Mendel, Ltd., M. Mark Mendel, Esquire, and Daniel Murray, Esquire, received notice of defendant The Home Insurance Company's reservation of rights, pursuant to the exclusionary clause of Policy Number LPL 1544603, on September 7, 1990.

4. Notwithstanding paragraph 1 of this Order, plaintiffs may proceed with their claim for relief based on the theory that The Home Insurance Company is estopped from denying coverage because plaintiffs M. Mark Mendel, Ltd., M. Mark Mendel, Esquire, and Daniel Murray, Esquire were actually prejudiced by Home's delay, until September 7, 1990, in issuing its reservation of rights.

5. The claim for relief of plaintiffs M. Mark Mendel, Ltd., M. Mark Mendel, Esquire, and Daniel Murray, Esquire, alleging bad faith by The Home Insurance Company, brought pursuant to 42 Pa.Cons.Stat. Ann. § 8371, shall be considered by the jury only to the extent that it concerns allegations of bad faith conduct committed on or after July 1, 1990.